SYLLABUS

*This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.*

**State v. Yusuf B. Allen (A-7-25) (090853)**

**Argued March 30, 2026 -- Decided July 29, 2026**

**JUSTICE WAINER APTER, writing for a unanimous Court.**

In this appeal, the Court considers the proper measure of "materiality" for a claim that the State failed to turn over evidence under Brady v. Maryland, 373 U.S. 83 (1963), including whether the materiality standard articulated in State v. Carter, 86 N.J. 300 (1981) applies, and whether the record in this case meets that standard.

Defendant Yusef B. Allen was tried for the murder of Lannie Silver, Jr. At the trial, Ruby Waller testified that on October 15, 1997, she and Silver went to a house where she purchased crack cocaine. When Silver inquired about purchasing drugs, defendant and Ben McNeil exited the house and yelled, "get the F out of here, [we] don't sell drugs [here], white mother-f*****." Silver put his hands up and backed away. Defendant went back into the house and returned with a gun, at which point Waller ran to her house. Defendant and McNeil continued to yell at Silver. Waller heard a gunshot, ran inside, and heard "several more" gunshots and "the victim screaming." She looked out the window and saw Silver fall to the ground, crawl to the middle of the street, and collapse. Waller anonymously called 911.

Waller testified that on October 27, after learning Silver had died, she contacted the Plainfield Police Department to give a formal statement. In that statement, she again identified defendant and McNeil as suspects and told police that she saw defendant holding a gun. Waller testified that she had three cocaine possession convictions from 1990 to 1991 and that she was arrested for shoplifting on June 21, 1998. Noting that the shoplifting case was ongoing, the prosecutor asked Waller whether she was expecting any benefit with respect to that case for her testimony in defendant's case. She said that she was not and that she did not have any matters pending when she gave her October 27 statement.

Defendant was found guilty of murder and weapons offenses. His conviction was affirmed on direct appeal. 337 N.J. Super. 259, 264, 275 (App. Div. 2001). In the many years since, defendant has been challenging the jury verdict in direct and collateral appeals brought in State and federal courts.

1

In 2013, defendant sought habeas relief in federal court.  Among other claims, defendant argued that the prosecutor violated Brady by failing to disclose Ruby Waller's April 19, 1991 plea agreement, pursuant to which she had received three years' imprisonment in exchange for testifying in the trial of her co-defendant.  The federal court found defendant's claim meritless; defendant then filed a motion for a new trial based on newly discovered evidence in state court, arguing that withholding the plea agreement violated Brady because the agreement "could have been used for impeachment . . . of the [S]tate's chief witness."

Following an initial denial of the motion, reversed by the Appellate Division, assigned counsel for defendant filed a motion for a "new trial based upon newly discovered evidence" under Carter, 85 N.J. at 313.  The motion court denied defendant's motion.  The Appellate Division affirmed in part and remanded in part.  482 N.J. Super. 142, 169 (App. Div. 2025).  As relevant here, the appellate court concluded that the motion court erred in evaluating defendant's claims under Carter, rather than Brady, but the error was harmless because "we see no practical difference between the materiality/harmless error elements set forth in the Brady and Carter formulations."  Id. at 164.  The Court granted certification limited to the appropriate materiality standard and its application.  261 N.J. 605 (2025).

**HELD:**  The Brady and Carter materiality standards are not the same.  Defendant has not satisfied Brady materiality in this case, so the Court affirms as modified.

1.  In Brady, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  373 U.S. at 87.  The Court later expanded Brady to apply to impeachment evidence as well as exculpatory evidence known to police investigators or to prosecutors, even if defendant submits no request.  There are thus three elements to a Brady claim:  (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  The third component, prejudice, is also known as the materiality requirement.  Because the materiality inquiry lies at the center of this case, the Court reviews its evolution in depth.  Brady itself did not set forth any test for materiality.  In Strickland v. Washington, the Court elaborated on why the materiality standard that governed a motion for a new trial based on newly discovered evidence was inappropriate for Brady claims, and also for ineffective assistance of counsel claims.  466 U.S. 668, 694 (1984).  Ultimately, the Court identified the materiality test for Brady purposes as requiring the petitioner to show "that there is a reasonable probability that his conviction or sentence would have been different had [the Brady] materials been disclosed."  Strickler v. Greene, 527 U.S. 263, 296 (1999).  (pp. 16-22)

2

2. State v. Carter, on the other hand, addresses situations in which a defendant comes forward after trial with newly discovered evidence that did not come from the prosecution. 85 N.J. at 313. For a new trial to be granted under Carter, "the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." Id. at 314 (emphasis added). That test "is more stringent" than the "Brady analysis." Ibid. (p. 22)

3. Reviewing those standards closely, the Court finds that the Appellate Division erred in holding that the Brady and Carter materiality standards are the same. For Brady claims, the word "reasonable" modifies "probability" -- and a "reasonable probability" that the result of the proceeding would have been different does not require a defendant to show that the verdict more likely than not would have been different, or to demonstrate by a preponderance that the verdict would have been different. The widely used standard for assessing motions for a new trial based on newly discovered evidence, however, generally does require a showing that the new evidence "more likely than not" would, or "by a preponderance of the evidence" would, change the outcome of the case. Strickland, 466 U.S. at 693-94. When it comes to materiality, "probably" or "more likely than not" is a more demanding standard than "reasonable probability." The Court clears up any confusion from cross quotations in past cases by holding today that "would probably change the jury's verdict" is a more stringent standard than "a reasonable probability" that the jury's verdict would change. (pp. 23-30)

4. Although it erred in holding that the standards for Brady and Carter materiality are the same, the Appellate Division reached the correct result because defendant has not met the Brady materiality standard. According to defendant, had he known about the 1991 plea agreement at trial, he could have suggested that "Waller's testimony was motivated by her interest in currying favor with the State in exchange for her testimony" because she "had previously received leniency for doing just that." The Court explains why that argument was not sufficient to raise "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Court is confident that even if Waller's 1991 plea form had been disclosed to the defense, the jury's verdict would have been the same. (pp. 30-33)

 **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

Yusef B. Allen,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
482 N.J. Super. 142 (App. Div. 2025).

| Argued | Decided |
|--------|---------|
| March 30, 2026 | July 29, 2026 |

Lucas B. Slevin, Assistant Deputy Public Defender,
argued the cause for appellant (Jennifer N. Sellitti, Public
Defender, attorney; Lucas B. Slevin, of counsel and on
the briefs, and Stephen W. Kirsch, Designated Counsel,
on the briefs).

Milton S. Leibowitz, Assistant Prosecutor, argued the
cause for respondent (William A. Daniel, Union County
Prosecutor, attorney; Michele C. Buckley, Assistant
Prosecutor, of counsel and on the briefs).

Jeffrey P. Mongiello argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Chiesa Shahinian & Giantomasi, attorneys; Jeffrey P.
Mongiello, Lee Vartan, Brittany Manna, and Liam Ryan,
of counsel and on the brief).

Thomas R. Clark, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Jennifer Davenport, Attorney General, attorney; Thomas R. Clark, of counsel and on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

In this case, we consider whether the standard for materiality under Brady v. Maryland, 373 U.S. 83 (1963), is the same as the standard for materiality under State v. Carter, 85 N.J. 300 (1981).

Under Brady, when the prosecution fails "to disclose evidence favorable to the accused," "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); accord id. at 685 (White, J., concurring in part and concurring in the judgment). Under Carter, when a defendant moves for a new trial based on newly discovered evidence that does not come from the prosecution, evidence must be "of the sort that would probably change the jury's verdict if a new trial were granted." 85 N.J. at 314.

Evidence that has a "reasonable probability" of changing the jury's verdict is a lower threshold than evidence that would "probably" change the jury's verdict. We therefore hold that the Brady and Carter materiality standards are not the same.

2

However, defendant has not satisfied <u>Brady</u> materiality in this case.  We therefore affirm the Appellate Division's judgment as modified.

I.

A.

Defendant Yusef B. Allen was convicted after a jury trial of the October 15, 1997 murder of Lannie Silver, Jr.  The following facts were elicited at trial.

Ruby Waller testified that early in the morning of October 15, 1997, Silver approached her on a street in Plainfield and asked where he could buy drugs.  Waller took Silver to what she called "the Mack House."  Waller approached a window on the front porch of the house and purchased crack cocaine from a person she recognized by voice as Ben McNeil.  She then stepped aside so that Silver could take her place at the window.  When Silver approached the window and asked "[w]hat you got?" McNeil and defendant exited the house and yelled, "get the F out of here, [we] don't sell drugs [here], white mother-f*****."

Silver put his hands up and backed off the porch.  McNeil and defendant followed.  Waller testified that as he followed Silver, defendant yelled, "[h]old up, I got something for this mother-f*****."  Defendant went into the house, returning "[a] second" later carrying a gun "[i]n his hand, down on the side."

3

When Waller saw defendant holding a gun, she ran towards her own home, which was on the same block. McNeil and defendant continued to yell at Silver. As Waller approached her front steps, she heard a gunshot. She ran inside. From there, Waller heard "several more" gunshots and "the victim screaming." She looked out the window and saw Silver fall to the ground, crawl to the middle of the street, and collapse.

Rhonda Whitfield testified that she was also on the street on October 15, 1997 to buy drugs at the Mack House. Whitfield testified that she was "dope sick" and paying "no mind," but she "knew something wasn't right." Whitfield saw defendant "yelling" at Silver, who was "trying to walk" away. Defendant was holding something against his right leg and "running behind [Silver]." Whitfield then heard what she thought were "firecrackers."

Waller anonymously called 911 and stated that "somebody had been shot and . . . was in the middle of the street." She called again later that afternoon, telling the police that, from the window of her home, she heard a gunshot and saw Silver fall. Waller identified defendant and McNeil as the suspects. She refused to provide her name, address, or telephone number.

Waller testified that on October 27, 1997, after learning that Silver had died, she contacted the Plainfield Police Department to give a formal

4

statement. In that statement, Waller again identified defendant and McNeil as suspects and told police that she saw defendant holding a gun.

In contrast, Waller testified that she later told defense investigators that she did not recall defendant holding a gun "[b]ecause I didn't want to be bothered. I was fed up. I just had my [door] kicked in." Specifically, Waller testified that more than a year after the shooting, in December 1998, three defense investigators came to her sister's home. Two investigators (Allen Mularz and June Davidson), approached the front door, while a third remained in the car. Waller went out onto the porch, without shoes and in the cold, and told Mularz that she did not want to speak to him. According to Waller, Mularz and Davidson stayed for no more than five minutes. Neither took notes, asked her to give a statement, recorded the conversation, or showed her any written report.

Mularz gave a very different version of that conversation. Mularz testified that he and Davidson spoke to Waller for approximately 70 minutes, and Waller never said she did not want to speak to them. Mularz testified that they asked Waller "four or five times" if she had seen a gun, and each time Waller responded that "she didn't see anybody with any guns." Mularz agreed that although he and Davidson had access to a tape recorder, a video recorder, and a pen and paper, they did not record the interview, take notes, or take any

statement from Waller at the time. Instead, when he and Davidson returned to the car, Davidson took notes and Mularz reviewed them.

Waller testified that on March 30, 1990, she was convicted of possessing cocaine in two separate indictments and received a sentence of three years' probation. She testified that on April 19, 1991, she was again convicted of possessing cocaine. This time, she was sentenced to three years in prison. Waller also testified that she was arrested for shoplifting on June 21, 1998. The following exchange then took place between the Prosecutor and Waller:

> Q: With respect to that last matter, ma'am, which occurred during the pendency of this [case], are you expecting any benefit with respect to that case for your testimony here today?
>
> A: No.
>
> Q: Has that case been concluded?
>
> A: No.
>
> Q: Have you -- that's in municipal court. Is that correct?
>
> A: Yes.
>
> Q: Are you represented by an attorney?
>
> A: No, I'm not.
>
> Q: Have you discussed the case with the prosecutor in municipal court?
>
> A: No.

6

Q: Have you asked to receive any benefit on that case as a result of your testimony here today?

A: No, I haven't.

Q: At the time that you gave your statement to the Plainfield police on October 27, 1997, did you have any matters pending at that point in time?

A: No, I didn't.

Q: Were you expecting any benefit at that point in time for giving your statement to the Plainfield police?

A: No.

[DEFENSE]: Objection. You can't support the credibility of one[']s own witness. I object.

THE COURT: Sustained. The answers to the questions are struck.

B.

Defendant was found guilty of murder, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. His conviction was affirmed, and defendant was ultimately sentenced to life imprisonment with 30 years' parole ineligibility. State v. Allen, 337 N.J. Super. 259, 264, 275 (App. Div. 2001). We denied certification.

In the many years since, defendant has been "persistent in challenging the jury verdict in direct and collateral appeals brought in State and federal

7

courts." State v. Allen, No. A-2192-17T1 (App. Div. Apr. 14, 2020) (slip op. at 2).[1]

In 2013, defendant, self-represented, filed a petition for a writ of habeas corpus in federal court. He later added a claim that the prosecutor violated Brady and Giglio v. United States, 405 U.S. 150 (1972), by failing to disclose Ruby Waller's April 19, 1991 plea agreement, pursuant to which she had received three years' imprisonment in exchange for testifying in the trial of her co-defendant Riccardo Bradley. Allen v. Warren, Civ. No. 13-4304, 2015 U.S. Dist. LEXIS 7302, at *10-11 (D.N.J. Jan. 20, 2015).

Defendant requested a stay so he could exhaust the Brady claim in state court. Ibid. The federal district court denied defendant's request, finding the Brady claim "plainly meritless." Allen v. Warren, Civ. No. 13-4304, 2015 U.S. Dist. LEXIS 38937, at *12 (D.N.J. Mar. 26, 2015). The court accepted defendant's allegation that although the prosecution disclosed Waller's April 19, 1991 conviction, it had not "revealed that th[e] conviction resulted from a cooperating plea bargain." Id. at *10. Nonetheless, the court concluded, "[t]here is no reasonable probability that the additional disclosure that Waller's

---

[1] We cite to unpublished opinions here only to establish the chronology of events and not for any principles of law. R. 1:36-3.

April 1991 conviction was procured through a cooperating plea bargain would have changed the result of Mr. Allen's trial." Id. at *12.

This was so, the court explained, because even if Waller's 1991 "plea deal could have been used to show that Waller had a general awareness that such a deal could be struck," unless it could "be linked in some way to a promise of leniency in return for [Waller's] testimony in Allen's murder case," it had "no significance." Id. at *11-12 (emphasis omitted). And there was no possible link because there was "no evidence or allegation that Waller came forward or testified in [defendant's] murder case as the result of any deal for leniency." Id. at *10. The court emphasized that Waller originally gave her statement to the police "at a time when no charge was pending" and that, even though she was then charged with shoplifting before testifying at trial, she had not even "consulted with counsel or spoken to the municipal prosecutor about" the charge, and "had not made any arrangement to obtain any benefit in connection with her testimony in [defendant's] murder case." Id. at *10-12.

Undeterred, defendant filed a motion for a new trial based on newly discovered evidence in state court. In connection with that motion, defendant certified that on March 22, 2014, he received a paper copy of Waller's April 19, 1991 plea form.

9

The plea form states that Waller was charged with third-degree possession of cocaine, which carried a statutory maximum of five years' imprisonment. Under Question 13, "Specify any sentence the Prosecutor has agreed to recommend," the following is handwritten: "*Testify truthfully at [co-defendant's] trial[.] Maximum 3 years flat State Prison[.] Any custodial term for violation of probation to run concurrently to this sentence[.]" Waller's 1991 Judgment of Conviction similarly states: "Defendant is to testify truthfully in the trial of Riccardo Bradley."

Defendant argued that "[t]he [S]tate violated <u>Brady</u>[] by withholding" this plea agreement because it "could have been used for impeachment . . . of the [S]tate's chief witness." An assistant public defender was assigned. The attorney investigated defendant's allegations and submitted a certification concluding that "there was not enough reliable information to validate a credible motion."

The motion judge therefore denied defendant's motion for a new trial. The Appellate Division reversed and remanded for the motion judge to "make his own findings," without relying on counsel's certification.

In February 2022, assigned counsel for defendant then filed a motion for a "new trial based upon newly discovered evidence" under <u>Carter</u>, 85 N.J. at 313. Counsel discussed the <u>Carter</u> requirements in detail and argued that all

10

three were satisfied. Specifically, counsel argued that Waller's 1991 agreement "to testify against her co-defendant in exchange for a favorable plea" was "clearly material" because Waller was "the State's chief witness," and "successful impeachment of Ms. Waller may very well change a jury's verdict."

The State responded that defendant could not satisfy Carter. According to the State, Waller's 1991 plea agreement was not material because there was no evidence that it required Waller to testify against defendant in his unrelated trial eight years later.

After a detailed review of Carter's three-prong test, the motion court denied defendant's motion. The court specifically concluded that "the fact that Ms. Waller agreed to testify against a co-defendant in exchange for a favorable plea deal 8 years ago has no relevance to the case at hand." It also deemed defendant's "allegation that Ruby Waller received a reward in exchange for her testimony" at his trial to be "mere[] speculation."

On appeal, defendant's appellate counsel argued that defendant's motion for a new trial should have been brought pursuant to Brady, not Carter. According to appellate counsel, assigned counsel therefore erroneously "relied upon the more stringent materiality standard set forth in State v. Carter"

11

instead of the more lenient standard applicable to motions brought pursuant to Brady.

The Appellate Division affirmed in part and remanded in part. State v. Allen, 482 N.J. Super. 142, 169 (App. Div. 2025). As relevant here, the appellate court concluded that the motion court erred in evaluating defendant's claims under Carter, rather than Brady, but the error was harmless because "we see no practical difference between the materiality/harmless error elements set forth in the Brady and Carter formulations." Id. at 164. According to the Appellate Division, "the Carter and Brady tests share a common element: as a prerequisite to the grant of a new trial, the reviewing court must determine whether the jury's verdict would have been different had the defense been aware of the new evidence before trial." Id. at 152 (emphasis added).

The Appellate Division reviewed the Brady and Carter tests at length. It acknowledged our statement in Carter that "[w]hereas the test of materiality for the granting of a new trial under a Brady analysis is simply whether the suppressed evidence might have affected the outcome of the trial, . . . the test to be satisfied under a newly discovered evidence approach is more stringent." Id. at 164 (alteration and omission in original) (quoting Carter, 85 N.J. at 314). But it nonetheless explained: "we do not believe that the Carter test is more stringent than the one prescribed in Brady with respect to the question of

12

materiality and whether the trial outcome would have been different if the evidence at issue had been disclosed to the defense prior to trial." Ibid.

The appellate court assumed "for the sake of argument that the first two prongs of the Brady test" were met. Id. at 165. However, it found that defendant could not satisfy the third prong because he could not show that "the trial outcome would have been different if Waller's 1991 plea deal had been disclosed to the defense so that it could be explored on her cross-examination." Id. at 166. Detailing the testimony at trial, the appellate court determined that "there is not a reasonable probability that had the 1991 plea agreement been disclosed to the defense, the trial result would have been different." Ibid.

Defendant petitioned for certification, arguing that the Appellate Division erred in concluding that "the materiality standards under Carter and Brady are the same."

We granted defendant's petition for certification, "limited to the proper measure of 'materiality' for a claim that the State failed to turn over evidence under Brady v. Maryland, 373 U.S. 83 (1963), including whether the materiality standard articulated in State v. Carter, 86 N.J. 300 (1981) applies, and whether the record in this case meets that standard." 261 N.J. 605 (2025). We also granted leave to the Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.

13

II.

Defendant argues that the Appellate Division erred in equating the Brady and Carter materiality standards because the standards are "plainly not equivalent." Instead, Carter is "more stringent" than Brady. (quoting Carter, 85 N.J. at 314). According to defendant, "Carter materiality requires a showing that the new evidence 'probably' would have changed the outcome [at trial], which is equivalent to a preponderance," whereas "Brady materiality requires a showing of a 'reasonable probability' that the evidence would have changed the outcome, which is less than a preponderance." Thus, "evidence that is sufficient to 'undermine confidence' in the outcome of the case will satisfy Brady materiality but not Carter materiality." And here, defendant contends, Brady materiality is satisfied because had the prosecutor disclosed Waller's 1991 plea agreement, defendant could have argued that "Waller's plea demonstrated that she knew how beneficial testifying for the State can be and was only testifying in [defendant's] case in the hope of currying favor with the State on her shoplifting charge."

The State agrees with defendant that "the Appellate Division incorrectly equated" the Carter and Brady materiality tests. The State also agrees that a "'reasonable probability[]' is not a preponderance of the evidence standard" and does not require a court to find it was "more likely than not that the

withheld evidence would have resulted in an acquittal. Rather, it is a slightly lower standard requiring consideration of whether the defendant received a trial resulting in a verdict worthy of confidence." However, the State contends that the Appellate Division was correct in concluding that defendant did not satisfy Brady materiality because "nothing in the 1991 plea agreement contemplated that Waller was required" to testify "at defendant's trial nine years later," and there was "no evidence that Waller received any promise or favorable treatment in exchange for her testimony at defendant's trial."

The Attorney General agrees with both parties that the Carter and Brady materiality standards are different. In the Attorney General's view, "[t]o succeed on a Brady claim, a defendant need only show that the new evidence undermines faith in the verdict, a showing that does not require demonstrating that defendant more likely than not would have been acquitted had the new evidence been before the jury." By contrast, the Attorney General asserts, a defendant who moves for a new trial based on their own "discovery of new evidence (untainted by prosecutorial error)" must "show that this new evidence 'probably,' that is, more likely than not, would have resulted in an acquittal." The Attorney General nonetheless argues that the Appellate Division reached the correct result because Waller provided the "critical statement -- that she had seen defendant holding a gun" -- long "before the shoplifting charge

15

arose," and there was no evidence that she testified at trial "in order to secure favorable treatment" on that charge.

The ACDL disagrees, contending that "the Appellate Division correctly concluded that the materiality standard is the same for Brady and Carter." The ACDL points to our decision in State v. Ways, 180 N.J. 171 (2004), asserting that it "interchangeably used the 'probably' language from Carter and the 'probability' language from Brady . . . demonstrating the standards are the same."

III.

A.

We review de novo the Appellate Division's determination of "what legal standard governs a Brady claim." State v. Marshall, 148 N.J. 89, 185 (1997). Whether evidence is material for Brady purposes is a mixed question of law and fact. Ibid. We defer to "the supported factual findings of the trial court," and review de novo the "application of any legal rules to such factual findings." State v. Harris, 181 N.J. 391, 416 (2004).

B.

In Brady v. Maryland, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

16

punishment." 373 U.S. at 87. The Court later expanded Brady to apply to "impeachment evidence as well as exculpatory evidence" known to police investigators or to prosecutors, even if defendant submits no request. Strickler v. Greene, 527 U.S. 263, 280-81 (1999).

Although, in modern parlance, "the term 'Brady violation' is sometimes used to refer to any breach of the [prosecution's] broad obligation to disclose exculpatory evidence -- that is, to any suppression of so-called 'Brady material,'" it is useful to recall that there is not an actual "'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Id. at 281 (footnote omitted).

There are thus three elements to a Brady claim: (1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the "evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." Id. at 281-82. The third component, prejudice, is also known as the materiality requirement. Id. at 282; see also State v. Martini, 160 N.J. 248, 268 (1999) (to establish a Brady violation, a defendant must show three things: "(1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material").

17

The materiality inquiry lies at the center of this case. We therefore discuss its evolution in some depth.

Brady itself did not set forth any test for materiality. The Supreme Court likewise did not settle on a test in its next major Brady case, United States v. Agurs, except to clarify that "[i]f the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found" by the defendant from a "neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice." 427 U.S. 97, 111 (1976). Therefore, where the "evidence was available to the prosecutor and not submitted to the defense," the defendant "should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." Ibid. (emphases added).

The Court elaborated on why the materiality standard that governed a motion for a new trial based on newly discovered evidence (that the "newly discovered evidence probably would have resulted in acquittal") was inappropriate for Brady claims, and also for ineffective assistance of counsel claims, in Strickland v. Washington, 466 U.S. 668 (1984). Strickland explained that "[t]he high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair

18

proceeding were present in the proceeding whose result is challenged." Id. at 694. Yet "[a]n ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable": a competent attorney. Ibid. Similarly, in Brady claims, the question is whether, without the exculpatory evidence that was suppressed, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

The Court therefore held that the "appropriate test for prejudice" for ineffective assistance of counsel claims "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." Strickland, 466 U.S. at 694. In other words, to demonstrate prejudice, or materiality, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid. The Court emphasized that this standard can be satisfied "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Ibid.

The next year, the Supreme Court confronted head on "the standard of materiality to be applied in determining whether a conviction should be

19

reversed because the prosecutor failed to disclose requested evidence that could have been used to impeach Government witnesses." Bagley, 473 U.S. at 669. Although the Court issued four separate opinions, five Justices agreed on the Strickland standard: for purposes of "prosecutorial failure to disclose evidence favorable to the accused," "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682 (opinion of Blackmun, J.); accord id. at 685 (White, J., concurring in part and concurring in the judgment). We explicitly adopted the Bagley standard in State v. Knight, 145 N.J. 233, 246-48 (1996).

In Kyles v. Whitley, the Supreme Court emphasized four aspects of Bagley materiality. 514 U.S. at 434. First, as the Court underscored in Agurs and Strickland, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Ibid. Instead, the "touchstone of materiality is a 'reasonable probability' of a different result." Ibid. In this context, "the adjective" reasonable "is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Ibid.

Second, materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-35; see also id. at 453 ("[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same.").

Third, once a court has found all elements of a Brady violation, including materiality, "there is no need for further harmless-error review." Id. at 435. And fourth, although evidence suppressed by the prosecution is "considered collectively, not item by item," "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Id. at 436-37.

In Strickler v. Greene, the Supreme Court underscored that the test is not whether using the suppressed evidence to "discredit[]" a witness's testimony "might have changed the outcome of the trial." 527 U.S. at 289 (emphasis added). And it is not whether there is a "reasonable possibility" that discrediting that witness's testimony "might have produced a different result." Id. at 291. Instead, petitioner must show "that there is a reasonable probability

21

that his conviction or sentence would have been different had [the Brady] materials been disclosed." Id. at 296 (emphasis added).

C.

State v. Carter, on the other hand, addresses situations in which a defendant comes forward after trial with newly discovered evidence that did not come from the prosecution. 85 N.J. at 313. For a new trial to be granted under Carter, "the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." Id. at 314 (emphasis added). That test, we noted in Carter, "is more stringent" than the "Brady analysis." Ibid.

The roots of the Carter test go back more than a century. Carter cited State v. Bunk, which similarly held that in order to be entitled "to a new trial on the ground of newly discovered evidence," a defendant must prove (1) that the new evidence is "material to the issue and not merely cumulative, nor impeaching nor contradictory; (2) that it has in fact been discovered since the former trial and could not have been discovered before such trial by the exercise of due diligence; (3) that it would probably change the result if a new trial was granted." 4 N.J. 482, 486 (1950). And Bunk cited older cases,

22

including <u>Christie v. Petrullo</u>, 101 N.J.L. 492, 494 (Sup. Ct. 1925) (holding that "[n]ew trials on the ground of newly discovered evidence" should be granted only where (1) "the evidence would probably have changed the result" at trial; (2) "due diligence was exercised by the party applying for a new trial"; and (3) "the evidence discovered is not merely cumulative") and <u>Paradise v. Great Eastern Stages, Inc.</u>, 114 N.J.L. 365, 367 (E. & A. 1935) ("New trials are not to be favored even on the ground of newly discovered evidence unless the court feels that the evidence, newly discovered, <u>more than likely would change the result</u> and that it could not have been presented at the trial by the exercise of ordinary diligence." (emphasis added)).

IV.

A.

We agree with the parties that the Appellate Division erred in holding that the <u>Brady</u> and <u>Carter</u> materiality standards are the same.

For <u>Brady</u> claims, i.e., claims of "prosecutorial failure to disclose evidence favorable to the accused," evidence is material "if there is a <u>reasonable probability</u> that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682 (opinion of Blackmun, J.) (emphasis added); <u>accord id.</u> at 685 (White, J., concurring in part and concurring in the judgment); <u>Knight</u>, 145 N.J. at 246-

23

48.  On the other hand, for <u>Carter</u> claims, or claims of newly discovered evidence that does not come from the prosecution, evidence is material if it is "of the sort that would <u>probably</u> change the jury's verdict."  <u>Carter</u>, 85 N.J. at 314 (emphasis added).

We heed Justice Souter's caution that the word "probability" "is naturally read as the cognate" of the word "probably" and can thus be "confused with" it.  <u>Strickler</u>, 527 U.S. at 300 (Souter, J., concurring in part and dissenting in part).  We therefore aim to clarify the difference between the two.

"Probability" means "the extent to which something is probable" or "the likelihood of something happening or being the case."  <u>New Oxford American Dictionary</u> 1391 (3d ed. 2010).  Probability is a noun.  As the Supreme Court explained in <u>Kyles</u>, if there is an adjective that modifies the noun, "the adjective is important."  514 U.S. at 434.

Indeed, when it comes to "probability," the adjective makes all the difference.  A "fair probability," a "small probability," and a "high probability" mean vastly different things.  If there is a "low" probability of rain, a prudent person may leave their umbrella at home.  If there is a "strong" probability of rain, that person may well grab an umbrella to avoid getting soaked.

24

The adjective -- or modifier -- applied to the word "probability" defines the degree of the probability at issue.  For <u>Brady</u> claims, that modifier is "reasonable" -- and a "reasonable probability" that the "'result of the proceeding would have been different,'" does not require a defendant to show that the verdict "more likely than not" would have been different, or to "demonstrat[e] by a preponderance" that the verdict would have been different. <u>Id.</u> at 433-34 (quoting <u>Bagley</u>, 473 U.S. at 682).

The "widely used standard for assessing motions for a new trial based on newly discovered evidence," however, generally <u>does require</u> a showing that the new evidence "more likely than not" would, or "by a preponderance of the evidence" would, change the outcome of the case.  <u>Strickland</u>, 466 U.S. at 693-94.

As used by courts, the word "probably" often means "more likely than not."  <u>See, e.g.</u>, <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (a habeas petitioner who must "show that a constitutional violation has <u>probably</u> resulted in the conviction of one who is actually innocent . . . must show that it is <u>more likely than not</u> that no reasonable juror would have convicted him in the light of the new evidence" (emphases added) (quotation omitted)); <u>DCPP v. J.R.-R.</u>, 248 N.J. 353, 376 n.11 (2021) ("The <u>preponderance of the evidence standard</u> is satisfied by 'that amount of evidence that causes [the factfinder] to conclude

25

that the allegation <u>is probably true</u>.  To prove an allegation by the preponderance of the evidence, a party must convince [the factfinder] that the allegation <u>is more likely true than not true</u>.'"  (alterations in original) (emphases added) (quoting <u>Model Jury Charges (Civil)</u>, 1.12H, "Preponderance of the Evidence" (approved Nov. 1998)); <u>Sawyer v. Whitley</u>, 505 U.S. 333, 366 (1992) (Blackmun, J., concurring) ("The defendant must show that he is <u>probably</u> -- <u>that is, more likely than not</u> -- 'innocent of the death sentence.'"  (emphases added)).

That is the case with <u>Carter</u>, which, as earlier noted, mirrors the "would probably change the result" formulation in <u>Bunk</u>, which itself relies on the "more than likely would change the result" standard in <u>Paradise</u>.  <u>See Carter</u>, 85 N.J. at 314 (citing <u>Bunk</u>, 4 N.J. at 486); <u>Bunk</u>, 4 N.J. at 486 (citing <u>Paradise</u>, 114 N.J.L. 365); <u>Paradise</u>, 114 N.J.L. at 367 ("New trials are not to be favored even on the ground of newly discovered evidence unless the court feels that the evidence, newly discovered, more than likely would change the result . . . .").

Dictionary definitions likewise support interpreting "probably" to mean "more likely than not."  <u>See New Oxford American Dictionary</u> 1391 (3d ed. 2010) (defining "probably" as an adverb meaning "almost certainly; as far as one knows or can tell"); <u>The Merriam Webster Dictionary</u> 397 (2019)

26

(defining "probably" as another form of "probable" meaning "apparently presumably true" or "likely to be or become true or real").

We therefore disagree with the Appellate Division's conclusion that there is "no practical difference between the materiality/harmless error elements set forth in the Brady and Carter formulations." Allen, 482 N.J. Super. at 164. When it comes to materiality, "probably" or "more likely than not" is a more demanding standard than "reasonable probability."

We agree with the ACDL that some of our prior cases may have introduced confusion, but we have never held that the materiality tests for Brady and Strickland are identical to the materiality test in Carter. We clarify today that they are not.

Ways considered a Carter motion for a new trial based on newly discovered evidence: statements from witnesses implicating a different person in the murder. 180 N.J. at 173. The body of the opinion discussed the Carter standard in depth, repeatedly explaining that the third prong is "whether the evidence is 'of the sort that would probably change the jury's verdict if a new trial were granted.'" Id. at 189 (quoting Carter, 85 N.J. at 314); see also id. at 187 (same); id. at 191-92 ("[T]he reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury."). And the Court ultimately

27

held that "[t]he new evidence" put forward by the defendant, "in our view, would probably change the outcome of the case." Id. at 195.

But, as the ACDL points out, in framing our holding, we also used the word "probability" twice: "we . . . hold that the newly discovered evidence presented at the PCR hearing creates a probability that a jury would return a verdict different from the one reached at the first trial," and "[w]e conclude that there is a probability -- not a certainty -- that a new jury would find Anthony Ways not guilty of the crime for which he is imprisoned." Id. at 197.

In State v. Allegro, we considered an ineffective assistance of counsel claim. 193 N.J. 352, 356 (2008). We correctly quoted Strickland's prejudice prong, which, as earlier noted, is the same as Brady's test for materiality: "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 367 (emphases added) (quoting State v. Castagna, 187 N.J. 293, 315 (2006) (quoting, in turn, Strickland, 466 U.S. at 694)). However, we then stated:

> in determining whether those additional witnesses are sufficient to prove to a reasonable probability that, absent counsel's failure to call those witnesses, the outcome of defendant's trial would have been different, we are guided, in part, by the standard applicable to claims of newly discovered evidence, that is, "that the evidence 'would probably change the jury's verdict if a new trial were granted.'"

28

[Id. at 370 (emphasis added) (quoting Ways, 180 N.J.
at 187 (quoting, in turn, Carter, 85 N.J. at 314)).]

That was the first time we quoted Carter's materiality test ("would probably change the jury's verdict") in the context of assessing prejudice under Strickland ("reasonable probability that . . . the result of the proceeding would have been different"). Nonetheless, we ultimately concluded, correctly, that even had the witnesses been called, there was no "reasonable probability that . . . the result of defendant's trial would have been different." Id. at 370-71.

We then relied on Allegro's recitation of the Carter standard in State v. Gideon, another ineffective assistance of counsel case about the failure to call alibi witnesses at trial. 244 N.J. 538, 551-53 (2021). After correctly stating the Strickland test -- that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 551 (quoting Strickland, 466 U.S. at 694) -- and block-quoting the above language from Allegro, id. at 552, we concluded that defendant had not shown that either of the witnesses' testimony "would probably change the jury's verdict if a new trial were granted," id. at 561 (quoting Allegro, 193 N.J. at 370 (quoting, in turn, Ways, 180 N.J. at 187)).

29

To clear up any confusion from cross quotations in <u>Ways</u>, <u>Allegro</u>, or <u>Gideon</u>, we hold today that "would probably change the jury's verdict" is a more stringent standard than "a reasonable probability" that the jury's verdict would change.

B.

Although the Appellate Division erred in holding that the standards for <u>Brady</u> and <u>Carter</u> materiality are the same, we agree with the State and the Attorney General that the Appellate Division reached the correct result because defendant has not met the <u>Brady</u> materiality standard. We accordingly affirm the judgment of the Appellate Division.

Assuming for the sake of argument, as the Appellate Division did, that defendant has met <u>Brady</u>'s first two prongs, he is unable to demonstrate that Waller's 1991 plea form had a "reasonable probability" of changing the jury's guilty verdict.

Defendant argues that "Ruby Waller's undisclosed plea agreement was favorable evidence" that he could have used to impeach Waller's "credibility by suggesting that she had a self-interested motivation to provide testimony favorable to the State in the hopes of getting leniency" on her "unresolved shoplifting charge." According to defendant, had he known that information at trial, he could have suggested that "Waller's testimony was motivated by her

30

interest in currying favor with the State in exchange for her testimony" because she "had previously received leniency for doing just that." In that way, defendant contends, Waller's 1991 plea agreement fills "a missing gap in [his] defense" that "would have drastically changed the contours of the case" by explaining why Waller was "lying during her trial testimony" in "hope[s] of currying favor with the State."

As the federal district court held, there are several problems with this theory. As an initial matter, Waller originally told police that she saw defendant carrying a gun on October 27, 1997, approximately eight months before she was arrested for shoplifting on June 21, 1998. At that time, she had no open charges on which to possibly seek leniency from the State.[2] See Allen, 2015 U.S. Dist. LEXIS 38937, at *10-12 (emphasizing that Waller gave her formal statement to the police "at a time when no charge was pending").

---

[2] Defendant argues that Waller's statement "made at the police station . . . [was] nothing more than her attempt to garner the same kind of favorable treatment that she received from the prosecutor back in 1991 by giving a version of events most favorable to the State," and Waller's only statements "which should be credited as accurate . . . were those made . . . when she had nothing to gain: her statements in the anonymous 911 call, and her statements to defense investigators." (emphasis omitted). Defendant overlooks that Waller had no pending charge when she gave the formal statement at the police station on October 27, 1997. She therefore had nothing to gain by telling police that she saw defendant holding a gun.

31

She then testified consistently at trial on January 13, 1999, six months after her shoplifting arrest. However, as Waller testified at trial, the shoplifting charge was pending in municipal court. Waller was not represented by counsel (and indeed was not entitled to have an attorney appointed), had never spoken to the prosecutor about the case, had never asked to receive any benefit related to the case, and had done nothing to connect the shoplifting charge to her testimony at defendant's trial. Ibid. (explaining that at the time she testified at defendant's trial, Waller had not "consulted with counsel or spoken to the municipal prosecutor about" the shoplifting charge, and "had not made any arrangement to obtain any benefit in connection with her testimony in [defendant's] murder case").

It would have been particularly nonsensical for Waller to perjure herself at defendant's trial in the hopes of gaining leniency on a municipal court shoplifting charge for two additional reasons. First, in 1998, shoplifting was a disorderly persons offense, not a crime, with a maximum punishment of a $500 fine. See N.J.S.A. 2C:20-11 (1998). Perjury, on the other hand, was and remains a third-degree crime with a maximum punishment of five years' imprisonment. See N.J.S.A. 2C:28-1(a) (perjury) and id. (1998); N.J.S.A. 2C:43-6(a)(3) (sentence range) and id. (1998). Defendant does not explain

why Waller would subject herself to up to five years' imprisonment to lower a $500 fine.

Second, we agree with the Attorney General that "[i]f anything, Waller's prior experience striking a plea deal would increase the odds that she understood how such deals work -- namely, that a deal is struck <u>before</u> actually testifying, and that you lose that leverage if you do not." In other words, if Waller's 1991 plea deal taught her anything, it was likely that any exchange of testimony for leniency should be formalized before the testimony is offered.[3]

Although the less stringent <u>Brady</u> standard requires only "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," here, there is no such reasonable probability. Instead, we are confident that even if Waller's 1991 plea form had been disclosed to the defense, the jury's verdict would have been the same.

---

[3] Defendant also argues that "defense counsel was able to characterize Whitfield as having testimony motivated by self-interest," and suggest that Whitfield "expected leniency in exchange for [her] testimony" "but could not argue the same for Waller." According to defendant, "had [the defense] been properly apprised of the fact that Waller previously received leniency in exchange for testimony, counsel could have easily made the same argument for Waller." But there was no evidence that Whitfield had ever received leniency in exchange for testimony in the past. Why defense counsel could argue that Whitfield was seeking to curry favor with the State, even though she had no prior cooperating plea agreement, but could only make such an argument for Waller if he had the prior cooperating plea agreement in hand, is unclear.

33

V.

For the foregoing reasons, the judgment of the Appellate Division is affirmed as modified.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.